No. 87.—SEMMES and others, plaintiffs in error, vs. THE MAYOR & COUNCIL OF COLUMBUS, defendants in error.

[1.] Defendants to a bill in Equity, may be called out of the county of their residence, and out of the county in which the suit is pending, to argue a motion to dissolve an injunction.

[2.] Injunctions granted on the *ex parte* showing of the applicant, are, under the 4th rule of Equity practice, granted on terms.

[3.] If there are more defendants than one to a bill praying an injunction, and the defendant or defendants against whom the equity is claimed by complainants, answer fully and deny the equity, the injunction may be dissolved without the answer of the other defendants.

[4.] When a bill praying an injunction is amended, the Court may hear and decide a motion to dissolve the injunction before the bill, as amended, is answered.

[5.] The Acts of 1845 and 1853, amending the charter of the City of Columbus, have no reference to cases where the money or credit of the city has been committed to any matter or thing, nor do they control or prescribe the manner in which the broad discretionary powers of the corporation shall be used in applying its assets to the payment of its debts.

[6.] The Mayor and Council of Columbus, if trustees, do not belong to that class of trustees against whom there is a remedy in a Court of Equity only; and therefore, the injunction will not be sustained against them on that ground.

[7.] But if they belonged to that class of trustees, being invested with discretionary powers in the matter complained of, a Court of Equity will not interfere with that discretion, when exercised *bona fide*.

[8.] A body corporate is not answerable for an *erroneous* exercise of a discretion, though its consequences be injurious.

[9.] Inadequacy of price, unless so great as, of itself, to be evidence of fraud, is not a sufficient ground for impeaching the contract.

[10.] It does not appear from the bill, that any certain advantage will accrue to either the complainants or citizens of Columbus, by sustaining the injunction; and the Court will not continue it unless some beneficial object can be accomplished by it.

[11.] It is a matter of sound legal discretion in the Court, to hold up the injunction or not.

In Equity, in Muscogee Superior Court. Decision by Judge WORRILL, at Chambers.

The plaintiffs in error, on the 24th day of November, 1855, presented their bill in Chancery, praying an injunction against the defendants in error, which was, on that day sanctioned, at Chambers, by Judge WORRILL, Judge of the Superior Courts of the Chattahoochee Circuit. The allegations in the bill are substantially, as follows : That complainants are property holders, and most of them citizens of Columbus ; that the City of Columbus, in the year 184–, subscribed' for stock in the Muscogee Rail Road, and issued city bonds for it, and owns 1800 shares and upwards. In April, 1855, a resolution was passed by the mayor and council, for the sale of stock, to raise funds to pay first instalment of city's subscription for the stock, provided it could be sold at a fair price, to be judged of by finance committee ; and if said stock could not be sold for a fair price, then said council intended to provide other means to raise funds to pay said instalment ; that Wiley Williams, mayor of the city, without authority and without consultation with the committee on finance, entered into a contract with Richard Patton and John L. Mustian, to sell to them 1800 shares of the said stock, being nearly all owned by the city, for the sum of One Hundred and Fifty-One Thousand Dollars ; Twenty-Six Thousand Dollars to be paid by the first day of January after the filing of the bill, and for the balance, $125.000, the purchasers were to pay the city bonds as they became due. This contract to sell, it is alleged, was made without informing the committee on finance, and without a resolution of council authorizing it ; that the city council had to pay $25.000 only, as the instalment agreed to in the resolution ; and to that extent only, was the mayor authorized to make sale of stock at a fair price, to be judged of by the finance committee ; and there was no authority given, either to the mayor alone or to the mayor and finance committee, by any resolution of the council, to sell all, or nearly all, of the stock belonging to said city, or any more than was sufficient to pay the said instalment, amounting to about the said sum of $25.000 ; that the

said sale was made privately, without public notice that the stock would be sold on a credit, and inviting bidders to make offers for the same; and that said sale was made at a price below the value of the stock, and less than would have been given for it if an opportunity had been given to others to offer for it, and less than other persons are now willing to give for it on the same terms; that said Wiley Williams, the mayor, made the contract without convening the committee on finance and submitting the matter to them, and without consulting them privately and separately, or even letting them know anything about it, until after he had made the contract on his own mere motion; and that they first heard of it as a matter of news and public talk; and that John J. McKendree, William A. Bedell and Henry T. Hall never had an opportunity, as a finance committee, to approve or reject said offer, until after the same had been signed by the said Williams as mayor, and the said Patton & Mustian; and not even then as a committee, but only as members of council, when the same was laid before said city council; that said contract was made on Saturday, and was, by Williams, as mayor, and not by the finance committee, reported to council on Monday, and a majority of the council refused to postpone any action on it until the next ensuing meeting, although exertions were made to induce them to postpone it, and added Williams, the mayor, to the committee, and directed the committee to consummate the contract; that the finance committee have not yet consummated the contract, although the said Williams was urgent for them to do it; and although some of the members of said committee had been informed that other persons were ready and willing to give a larger price for said stock, and were willing to wait until the next meeting of the council; that the customary opportunity of re-considering the proceedings in relation to the sale of said stock, may be afforded, and which is the established rule in the proceedings of said council; that the said Patton & Mustian, their associates and friends, are anxious to hurry the

matter to a conclusion, because they confidently believe, if they do not know, that an inadequate price has been given for said stock, and that a larger price could readily be obtained; that a consummation of said sale would operate a great fraud upon the people and property holders of Columbus, to whom the said stock belongs. These are substantially the allegations in the bill. The bill prays for a *subpœna,* an injunction and general relief.

The city council answered the bill, admitting the subscription for stock in the Muscogee Rail Road, for the sum of $150.000, and the giving of bonds of the city for said amount, payable in annual instalments of $28.000 each, and setting forth the circumstances which led to the subscription. The bonds were negotiated by the city council for the purpose aforesaid, and are now in the hands of *bona fide* holders unpaid. The answer further states, that for these bonds and the interest paid on them by the city, the rail road company has issued to it stock to the amount of $180.000. The first instalment of $25.000 of the bonds, fell due 1st July, 1855. In order to provide for the payment of that instalment, it having been the general understanding, at the time of subscription, that the stock was to redeem and pay the bonds, the city council passed a resolution authorizing a sale of part of the stock. The only alternatives to raise the means of paying this instalment, was to borrow the money, tax the city or sell the stock, and the last the wisest resort. Not being able to sell enough of the stock at 80 cents in the dollar to pay the instalment due, the council was compelled to borrow $30.000 on a pledge of stock and at a high interest, for ninety days; and when that debt was about to mature, they were compelled to resort to another loan on a still heavier pledge of stock in the road, and which the answer alleges would be at the disposal of the lenders, unless payment is made or an extension is obtained. The city council, for reasons stated in the answer, during the passed summer, informally, without a resolution, agreed to sell the stock, for the purpose of relieving the city from her liability on the bonds; and in pursuance

thereof, an effort was made to sell it in Charleston for $150,-000, the interest to be paid, and instalments, as they became due. The stock could not be sold in Charleston or elsewhere, on the terms stated, and it was then offered by the mayor to the defendants, Patton and Mustian, who agreed to take it on terms specified in exhibit (B) annexed to the complainant's bill. On the Monday night afterwards, at a regular meeting of council, reported what he had done, a copy of the report annexed to answer as exhibit (A).

The answer of the city council proceeds, further, to state that the action of the mayor was not without authority or in violation of his duty in the premises; that he was not acting under the resolution of April, but under the said informal understanding, and that he did not pretend, without the concurrence of council, to sell the stock, and that it was understood by the parties, that the council were to ratify the act; that the said Williams made no contract by which the stock of the city was sold; but on the contrary, he received and reported proposals for its sale; that the city council made, ratified and confirmed it; that it was their act and deed, and that the ratification was known to complainant, Paul J. Semmes, before the filing of the bill; that said stock was not sold below its value; that they could get no more for it from responsible parties; the council had tested the market, and the price at which it was sold to Patton and Mustian, was more than that offered by any one else; that complainants made no offer for it until after it was sold, though some of them knew that a part or all of it was for sale; that they made no offer before council had ratified the sale to Patton & Mustian, although they knew the terms on which it was to be sold to them; that individual stockholders had sold for less, and others had offered at 85 cents, and could not get it; that the stock was not sold at an inadequate price, but at the market value; that council submits, that if more had been offered by irresponsible parties, or by parties wanting in promptness or disposed to litigate, the interest of the city would have required a discrimination in favor of promptitude.

and responsibility; that defendant is not prepared to declare what other parties might now be disposed to offer, but they believe that they would not offer such an advance as would authorize the repudiation of a contract fairly made, and after notice to some of the complaining parties; that there was no fraud in the sale, and that said sale will not operate as a fraud upon the city, but will be of great benefit to it and the citizens, and sets forth reasons; that they neither published the stock for sale in the newspapers, nor put it up at auction; that a prudent stockholder would never think of enhancing its value in the market by making known the necessity of a sale, nor would he put it up at auction without a minimum price to prevent combinations; that such a course would have deteriorated the price of the stock; and that if it had been pursued, no such price would have been obtained for it; that complainants live in the city, or have property therein, subject to taxation; but the council is of opinion that they would prefer to make something out of the stock rather than to pay taxes; that Patton & Mustian reside in the city, or have a large property therein, and the council presumes they expect to make something by their contract; but the council feel assured that they have made a good trade for the city; that they were bound to look after the interest of the city; and in doing what they have done, they consulted that and that alone.

The defendants, Patton & Mustian, answered the bill, and admit that the stock was offered to them at the time stated by the mayor, Williams, with whom they agreed on terms, to be submitted to the council for ratification, which was reported by the mayor to the council on the Monday night afterwards, and was by them ratified and confirmed. They deny that the contract was made with them in private or clandestinely, or with any intent on their part to commit a fraud.

They answer, that the contract was made by them fairly and honestly, for a fair market price and for an adequate consideration, and they are of the opinion and belief that it will be of an advantage to the city, and will not operate as a

fraud; but they would not have made the purchase if they had not believed they could have made something by it.; they may realize a profit, but they had to take upon themselves the hazards of the enterprise; they feel, however, that they made as liberal a contract with the city. as could have been made at the time; they tendered the security required under the contract, which was considered by members of council ample and sufficient, and have been at all times, and now are ready and willing to comply, in all things, with their part of the agreement; that they desired the council to act in this matter with their usual and reasonable dispatch, but they assert that they did not attempt to hurry the contract to a consummation for any unfair purpose, or for the purpose of gaining any unfair advantage; and that no unusual haste or hurry was practised by said council, in acting on said agreement; they have read the answer of defendant, Williams, and adopt it, except so far as it is qualified by their answer.

The defendant, Williams, answers that complainants are citizens of Columbus, or its vicinity, and own property therein; but denies that they have any interest, whatever, in the stock owned by the corporation of the city in the Muscogee Rail Road, or that their persons or property are in any way liable to be taxed for the payment of the principal due or to become due, on the bonds issued by the city, for the purchase of the stock; that the corporation own said stock in their own right, and not as trustees or agents for complainants; that they can, in no event, claim any right or interest in the stock; that the mayor and council of the City of Columbus, have a perfect right to sell said stock, and apply the proceeds thereof to the payment of the debt contracted by its purchase; and defendant, therefore, demurs to the said bill, and prays that it may be dismissed.

The defendant further answering, says, that the mayor and council of the City of Columbus, about the year 1850, in their corporate capacity, subscribed for 1500 shares in the said rail road, and issued bonds in payment to the company, in the sum of $150.000; that the bonds bear interest, payable

semi-annually, on the 1st of January and July of each year; that the first instalment of $25.000 becomes due on the 1st of July, 1855; and other instalments of like amount become due annually, at the same time, until all shall be paid; that interest was allowed on said stock up to the time the road went into operation and declared dividends; and by the accrual of this interest and the payment of it in stock, the stock was increased to over 1800 shares.  The answer, then, proceeds substantially, (but with rather more particularity,) as the answer of the mayor and council, to detail the efforts to sell the stock, their failure, the borrowing of money, and other efforts to sell in Charleston and elsewhere, and the exigencies of the case, which led finally to the sale.  He proceeds to state the contract for the sale of the stock to defendants, Patton & Mustian, and says that it was made without consulting with the finance committee or any member of the city council, or any other person whatever.  Defendant denies that he made or attempted to make, any contract in reference to the sale of said stock to said Patton & Mustian, binding on the said mayor and council, but avers that the proposition or agreement was reduced to writing, for the purpose of submitting the same to the mayor and council for their ratification or rejection; that on Monday night, the 19th of November, 1855, the proposition, as reduced to writing, was reported to the mayor and council, at their regular meeting, who, upon consideration thereof, in the lawful and usual exercise of their power and authority, ratified and confirmed the same as their own lawful and binding contract. He annexes a copy of the report and proceedings of council, as exhibit (A) to his answer.

The said answer farther states, that the mayor and council are under obligation to pay, in the City of New York, on the 27th day of December, then next, $31.000, for which one thousand shares of stock are pledged; and a further sum of $25.000 will be due on the 1st of July, then next; that the difficulty of raising a large sum of money in a short time, dictated the propriety of making arrangements to raise so large

a sum of money before the arrival of the day of payment; that a contrary course must result in the necessity of exposing the stock at auction, and subject it to the effect of combinations amongst capitalists, and a sacrifice of it. In making the terms of agreement for the sale of said stock, he did not act under the resolution of April, as the action contemplated by that resolution had taken place, and the committee having reported, were considered as discharged; and that the committee on finance had nothing to do with it, as it had to undergo the consideration and ratification of the mayor and council. The terms of agreement were made without advertisement. Defendant denies that the terms of said agreement were privately made, if complainants intend to infer by said allegation, that they were made with any purpose of fraud or concealment; the propositions for said stock were made and discussed at a meeting of the board of directors of the Muscogee Rail Rail Company, and were agreed upon directly afterwards, on Saturday the 17th of November, 1855, and they were reduced to writing and signed on Monday afterwards. Defendant denies that the stock was sold below its Market value; that 80 cts. was the highest price which the council or their committee had been offered for it.

The answer proceeds to state what citizens of Columbus had offered stock at, and what it was then offered at. Defendant answers, further, that the price obtained for said stock was adequate and fair, and that it will release the city from her indebtedness on account of her subscription. In August or September last, the board of directors of said company convened to consider of the profits, and to make a dividend for the six months previous; and finding the earnings insufficient, it was about being declared, when the mayor of the city interposed because of the disastrous consequences likely to result therefrom, in the depreciation of the stock, and driving the city authorities to resort to taxation to pay the interest, and suggested that a dividend be made, payable in December, 1855, which was done; the mayor and council relying on their dividends on the stock to pay the

semi-annual interest on the bonds, the uncertainty of this re-
liance was a good reason why they should dispose of the whole
interest in the road, and induced defendant to believe that
the price offered for the stock was adequate and fair. In
addition to this reason, the original work on the road was not
of the most substantial sort; and the last report of the board
of directors showed that contracts had been made for work
to about $100.000, and which had been paid for in stock,
diminishing the value of it. The iron was light and unsub-
stantial, which had been laid on the road; and from opinions
entertained by stockholders, it must soon be re-laid with a
heavier rail. Defendant does not admit that the city council
can re-consider a contract that it has made; but in this case,
the proceedings of council at the former meeting were read
and approved, and no motion made to re-consider.

Patton & Mustian submitted the security for the perform-
ance of said contract; that the security they offered was a
cash payment of $26.000, deed of trust with power of sale
on 1800 shares of stock, and mortgage on upwards of $50.-
000 worth of real estate and slaves, in and about the city of
Columbus; that every member of the committee was satisfied
with the security; that two of them were willing to report
the same as satisfactory; that two of them declined signing
it on the ground that they preferred devolving on the council,
which would meet in three or four days, the responsibility of
judging of said securities. Defendant denies that the con-
summation of the contract would operate as a great fraud
upon the people and property holders of the City of Colum-
bus, but avers it to be a good contract.

The defendant further answering, from his information and
belief, says, that Paul J. Semmes, the verifying complain-
ant in said bill, before he made and placed his jurat to said
bill, made application to said defendant, Patton, to be let in
as a partner to said contract; that Seaborn Jones, the Solic-
itor for complainants, and Charles Cleghorn, who presented
the bill for the sanction of the Chancellor, and before he pre-
sented it, applied to defendant, Mustian, to be let in as a

partner to the contract; denies fraud and unfairness in the contract, and avers that it was legally made, and is binding.

On the filing of the answers aforesaid, the Judge of the Superior Courts of the Chattahoochee Circuit, granted an order, at the instance of defendant's Counsel, that the complainants show cause, at Talbotton, in the county of Talbot, on the 18th December, 1855, why the injunction in said cause should not be dissolved, on the grounds—

1st. That there is no equity in said bill of complaint.

2d. That the answers above filed, have fully sworn off all the equity contained in said bill of complaint.

The complainants appeared at Talbotton in obedience to the order, when, by the consent of all parties, the said bill was dismissed as to three of the complainants, Joseph B. Hill, Robert B. Murdock and Joseph Kyle. The other complainants objected to the Judge's hearing any argument or making any order in said case at Talbotton, on the ground that the case is pending in the Superior Court of Muscogee County, and that all the parties, both the complainants and defendants, lived in that county, and that they could not be called out of the county of their residence, and out of the county in which the suit was pending.

The Judge over-ruled the objection, and complainants excepted.

Complainants' Counsel then objected that said case could not proceed, as the answers of Hall, McKendree and Bedell, the finance committee, had not been filed; which was over-ruled, and plaintiffs excepted.

Complainants then moved to make an amendment to their bill, and that the injunction granted in said case should not be dismissed till the answers of the defendants were filed to said bill as amended; and after hearing argument on the bill, amendment and answers as filed, the said Judge allowed the said amendment to be made to said bill, and ordered the injunction to be dissolved.

Complainants excepted.

Error is assigned on each of these exceptions.

The complainants amended their bill, and alleged—

That on Saturday, 17th November, 1855, at a meeting of the directors of the Muscogee Rail Road Company, it was stated by the defendant, Patton, the president, in the hearing of Williams, the mayor, and one of the directors of said company, that the Savannah papers quoted the stock at $90 per share; that Williams, after hearing it, offered to take $150.000 or $151.000, for 1800 shares of said stock owned by the City of Columbus; that Patton soon after said he would take the stock at that price, and that Mustian, also one of the directors, said he would go his halves, which was agreed to; and thus, the stock of the city, amounting to $180.000, was thus bargained away, on Monday, the 19th of November; the contract was reduced to writing, and the faith of the city pledged to carry it out; that the Muscogee Rail Road stock was quoted at $90 a share in the Savannah newspapers; that when the said Williams reported said agreement to the city council, he did not inform them that the said stock was quoted in the Savannah papers to be worth $90 a share, or that Patton had said so; nor did he report said contract as a bare proposition, but as an agreement already made; and induced them to believe, and especially some of the members of the finance committee, that the council had given him, as mayor, authority to sell said stock; some of the council and of the finance committee voted to ratify the agreement under that belief, and would not have so voted, but would have voted for a postponement until the next meeting, if they had known there was no such authority; that other offers might have been made; that J. J. McKendree, a member of the finance committee, stated that he had assurances from gentlemen who were able to comply, that a higher price would be given for said stock; the names of the gentlemen he could not then give.

The amended bill further states, that during the week, to-wit: on the 22d, and before the details of the contract had been carried out and the securities had been accepted from

said Patton & Mustian, Paul J. Semmes, Seaborn Jones and Charles Cleghorn, did make an offer to take 1800 shares of the stock at $87 per share, being $5600 more than had been agreed to have been paid by said Patton & Mustian; that when the offer was made in writing, the said Williams, the mayor, refused to read it or to permit it to be read to him; and the same was then handed to John J. McKendree, one of the finance committee; that about ten days before said contract was entered into, the said Muscogee Rail Road had made an advantageous arrangement with the Central & So. West. Rail Roads, by which the proportion of freights, of passengers, merchandize, &c. from Columbus to Savannah, and from Savannah to Columbus, was increased near twenty per cent.—tending to increase in that ratio the share of the profits of said stock, which was before bringing 8 per cent. dividends, and that it was well known to Patton & Mustian and Williams; that it was not made known to city council by Williams, at and before he urged the ratification of the agreement, and that it was unknown to the members of council when they were urged to ratify.

City owns a few more shares in the rail road company—some sixteen or eighteen—number unknown to complainants, but known to defendants, which amended bill asks may be set forth, with the reasons that they were not sold; that after city council had determined to sell part of said stock, application was made to said McKendree, one of the finance committee, to get some at $85 a share; and he stated that it had been informally taken among the members of council, and that they had concluded not to sell at less than $90 per share; which statement was some weeks before the agreement with Patton & Mustian.

S. Jones; H. Holt, for plaintiff.

Johnson; Welborn, for defendant.

*By the Court.*—McDonald, J. delivering the opinion. ·

The first error assigned by complainants' Counsel is, that the Judge called the defendants out of their county, and required them to argue the motion to dissolve the injunction in Talbot County.

[1.] The parties, complainant and defendant, resided in Muscogee County, and the cause was pending in that county. The Chancellor may order an injunction, instantly, on the *ex parte* showing of the complainant; and the exigency of the case frequently requires that he should do it. But the writ of injunction is a strong process, and the party against whom it is granted should be allowed an early opportunity to move to set it aside. The 4th rule in Equity enables him to do it. ·

[2.] *Ex parte* injunctions, in Georgia, are always granted on terms, because they are subject to the operation of that rule; and the terms prescribed by it are as binding as if they were incorporated in the sanction of the Judge.

The hearing of a motion to dissolve an injunction, is no more the trial of the case, than the hearing of an application for an injunction; and the argument may be heard at Chambers.

[3.] That several of the defendants had not answered the bill, was no sufficient objection to hearing the argument and determining the motion to dissolve the injunction. The remedy sought by the bill, was against the Mayor and Council of the City of Columbus. If there was equity in the bill warranting the interposition of a Court of Chancery, it was against the mayor and council; and the city council had answered under its corporate seal, and the mayor, who, it is apparent, from the bill and the amended bill, was more conversant with the facts charged than any one else, had answered under his oath. No decree for a perpetual injunction would go against the defendants who had not answered, nor could their answers, however made, have the slightest influence un-

der the allegations of complainants, against the defendant, the Mayor and Council of the City of Columbus. The defendants against whom the complainants claimed the equity, if any, had answered; and if the answers were full and denied the equity, the injunction ought to be dissolved. The Court, therefore, committed no error in refusing to postpone the argument, and in dissolving the injunction without the answers of the other defendants.

[4.] The amendment of an injunction bill, unless allowed by the Chancellor without prejudice to the injunction, displaces the injunction. In this case, the motion to amend the bill was allowed, but the Court refused to grant it as asked for, to-wit: that the injunction should not be dissolved until the answers of the defendants were filed to the bill as amended; and the Court, after allowing the amendment, ordered the injunction to be dissolved.

The party might have amended his bill as a matter of right, and to have refused it would possibly have been error in the Court; but the allowance of an amendment by the Court which the complainant could have made, as a matter of right, does not necessarily operate as a continuance of the injunction until answer. On a motion to dissolve an injunction, on the ground that there is no equity in the bill, the facts alleged in the bill must be taken as true; and when the motion is predicated on the denial of the equity by the answer, the answer is to be considered as true.

If the motion be resisted, on the ground that the complainant has amended his bill, alleging new facts which have not been answered, the Chancellor, (waiving the effect of the amendment as a dissolution of the injunction,) will extend his consideration to the amendment bill, to the manner and substance of the allegations therein, and determine whether they afford sufficient grounds for retaining the injunction, if it ought otherwise to be dissolved. The Court, therefore, committed no error in deciding on the motion to dissolve, before defendants answered the amended bill.

Did the Court err in dissolving the injunction, on the grounds taken in the motion?

It is insisted by Counsel for plaintiffs in error, that the Acts of 1845 and 1853, inhibit the mayor and council from making contracts of the description and magnitude of that made for the sale of the rail road stock, and in the manner in which that was made.

Let us, for a moment, examine the power of the mayor and council to make contracts, and then look to the Acts of 1845 and 1853, and see how far they control it. By the 12th section of the Act of 1853, the mayor and members of council are vested with special powers to make all contracts, in their corporate capacity, which they may deem necessary for the welfare of the city.

[5.] The power conferred by that Act to contract, has no limit. It is full; and they are vested with the largest discretionary powers. The Act of 1845 declares, " that no vote, resolution or order of said mayor and council, for the payment of money, or for the performance of any act or measure involving an amount exceeding the sum of three hundred dollars, except the regular and current expenses of the city, shall be of force and effect, unless it be by the act of a majority of the whole board, at two successive meetings thereof; which said vote, resolution or order, shall be published in one or more of the public Gazettes of Columbus, between the first and second passage." (*Acts of* 1845, *p.* 67, *Sect.* 7.) This Act goes to the extent, and no further, to prevent the mayor and council from embarking the money or credit of the city, exceeding the amount of three hundred dollars in new enterprizes, except the current expenses of the city, without giving notice to the people and re-affirming the measure after notice, by a vote of a majority of the whole board. It has no reference to a case where the money or credit of the city is already committed. It has no reference to the application of money or assets to the payment of debts; for they create an obligation, that the resolutions of the corporation, whether adopted voluntarily or by the counsel of

the people, cannot lawfully resist.   It only has reference to such cases of projected expenditures of money, as it might be supposed an interested constituency would desire to make their wishes known upon.

It seems that the subscription for the stock in the Muscogee Rail Road, was made, and the city bonds were issued in payment, after the passage of the Act we have been considering ; and it is to be presumed that the matter was submitted to the citizens, in conformity to the Act; and if so, the subscription, so far as that objection is concerned, creates an obligation to pay; and the obligation to pay is a sufficient authority to pay, without new votes, resolutions or orders.

The Act of 1853, page 242, is more explicit than that of 1845.   It is declared by that Act, to be unlawful for the Mayor and Council of the City of Columbus to loan the credit of said city, contracting debts, issuing the bonds of the city, or using, in any way, the funds of said city, beyond the sum of ten thousand dollars, for *the purpose of being expended, or otherwise applied, beyond the corporate limits of said city, or in aid of any rail road company, or any other project foreign to the government of said city,* without first passing, by a majority of said mayor and council, a resolution to such effect.   This resolution is to be published and submitted to the voters of the city ; and if it be approved by a majority of those who vote on it, it is to be again submitted to the mayor and council ; and if it be again approved by them, it becomes a binding ordinance of the city.

The sale of the rail road stock does not fall within the prohibitions of this Act.   It is not the loan of the credit of the City of Columbus ; it is not the contracting of a debt ; it is not issuing the bonds of the city ; it is not using the funds of the city, for the purpose of being expended or applied beyond the corporate limits of said city, or in aid of any rail road company, or any other *project* foreign to the ordinary purposes of the government of said city.   It was a resolution affirming an agreement for the sale of certain assets of the city, to pay the debts of the city ; it was not a resolution *to*

*issue the bonds of the city*, but to convert the assets of the city for the purpose of paying the bonds of the city, which had already been issued.

There is nothing, in either the Acts of 1845 or that of 1853, to interfere with the broad discretionary powers of the mayor and council to deal with the assets of the city, according to their best judgment, to pay its debts.

[6.] The Counsel for plaintiff in error insists, again, that the mayor and council are only trustees for the citizens, and are bound, like all trustees, not to sell or dispose of the property of the city at an undervalue. The mayor and council are vested, by the Act which creates them, in all matters of contract, with special discretionary powers. They may make any contract which they may deem necessary for the welfare of the city. They are not trustees, in the technical sense in which Courts of Equity regard that term. Courts of Chancery, from their inherent jurisdiction, have assumed the control over trustees in the discharge of their duties. (*Hill on Trustees*, 42.) But these are trustees against whom the only remedy is in a Court of Chancery. The mayor and council, if trustees, do not belong to that class.

Executors and administrators, factors and agents are, in one sense, trustees. They all have the property of others in their possession, and are bound to fairness and honesty in dealing with it; but Courts of Chancery have never assumed to control them in the discharge of their duties. Nor have they ever assumed control over corporations. They make an exception where corporations hold to charitable uses. They have disclaimed jurisdiction where an officer had misapplied the corporate property to purposes not corporate. (2 *Johns. Chan. Rep.* 384.) In the case of *The Mayoralty of Colchester vs. Lawton*, the Lord Chancellor held, "that there was no instance of a *trust* attaching upon the misapplication of funds by corporations, except in the case of corporations holding to charitable uses." (Cited in the above case from 1 *Veasey & Beame*, 226.) The bill in this case cannot be

sustained, therefore, against the defendants, on the ground, simply, that the mayor and council are trustees.

[7.] In the case of trusts cognizable in a Court of Equity only, if the trustees have a discretionary power, to be exercised according to their judgment, a Court of Equity will not interfere to control the trustees acting *bona fide* in the exercise of their discretion. (*Hill on Trustees*, 488.) There are cases which might seem to conflict with this rule, but it will be found, when examined, that they do not clash with it. In the case of *Cloud vs. Martin*, (1 *Dev. & Bat. Law*, 397,) the testator directed that his grand-son should be raised and taken care of, at the direction and care of his son, J M and should be instructed in the English, Latin and Greek languages, and he appointed J M one of his executors. The Court put its decision in that case, it is true, upon its power to control a trustee in the exercise of a discretionary power, holding that such jurisdiction was established. That is true, if such trusts as the above are to be considered trusts, in which the trustees have discretionary powers. I respectfully insist, however, that that was not the description of trust created by the testator's will. The will imposed two duties on J. M. in regard to the rearing and education of the testator's grand-son—the one as executor and the other as trustee. The raising, and taking care, and education of the grand-son, was no part of the duty of J M *as executor*. By proving the will, however, he accepted the independent trust which the will created for that purpose. As executor, he was bound to furnish the funds from the testator's estate, to carry out the trust. The will of the testator was positive and direct, as to the trust. There was no discretion with J M in regard to that. The grand-son of testator was to be raised and taken care of, and to be instructed in the English, Latin and Greek languages. The raising and taking care of the grand-son was to be at the *direction and care of his son*. This provision of the will constituted J M the trustee for the specified purpose.

If J M had not been executor and had manifested his acceptance of the trust for the grand-son, by receiving funds from the executor for the purpose of carrying it out, and had refused to apply the funds and direct the raising and taking care of the grand-son, it would have been the ordinary case of a trustee accepting a special trust for an infant, and refusing to execute it. The Court will, in such case, compel the trustee to discharge a duty which, while trustee, he has no discretion to refuse.

In *Frouty vs. Frouty*, (1 *Bailey's Equity*, 518,) Judge *O'Neall* lays down the true rule: " In the execution of a general power, there can be no rule but the discretion of the party to whom it is confided. In a limited one, the limitations contained in it constitute the rule by which it is to be executed. In the former, no Court can undertake to control that which the party creating the power intended to leave to the honesty, discretion and good faith of the person to whom he confided it." But none of these cases have reference to corporations, or the persons who constitute the body corporate. The mayor and council have authority to pass by-laws for the good of the city. They must exercise their judgment, and what Court can control them? They have power to make such contracts as they may deem necessary for the welfare of the city, and what Court has the right to supervise and control their judgment? Where the corporation have the power of doing an act or not, at their discretion, the Court will never interfere with the lawful exercise of the discretion. (*Grant on Corp.* 231, *note u.*)

[8.] Where a body has a discretion conveyed to them, an erroneous exercise of that discretion, however plain the miscarriage may be, and however injurious its consequences, they shall not answer for it to the party. (*Grant on Cor.* 252, *note r.*)

It often happens that the ordinances and contracts of municipal corporations, however fairly and honestly passed or made, not only do not meet the approval of all the citizens, but are censured and condemned by a part of them; and yet,

such disapproval, however plausibly sustained, would not jus-
tify the Court in interfering with the legitimate exercise of
the functions of the body.   It will be remarked, that the suit
against the defendants in this case, is not for a fraudulent
breach of duty.   It is against the corporate body, and not
against individuals, for a breach of trust.   It is to enjoin the
corporation from executing a contract which it had made,
and in regard to which it had a discretion—and which discre-
tion, it is not charged, has been fraudulently used.   It is in-
sisted that the facts alleged by complainants, exhibit the
transaction in such a light as to call on the Court to prevent
the execution of the contract.   Before the Court can inter-
fere, it must infer fraud—a charge that the complainants
have no where made directly.   The Court is not prepared to
say, that in making the sale of the stock, there was either an
abuse or fraudulent use of discretionary power by the mayor
and council.   If the mayor, Williams, without authority,
and without consultation with the committee on finance, did
enter into a contract with Patton & Mustian, to sell them
nearly all the stock owned by the city; and if the contract
was signed, and the committee did not know it until it was
submitted to the board, and it was submitted to the council ;
and if a postponement was refused by a majority of the board,
who directed the committee to consummate the contract,
there is nothing in all this to impugn the honesty of the
transaction.   From William's acknowledged want of author-
ity to make the contract, he submitted it to the council.   If
he had made the contract with authority, it would have been
complete and perfect without the ratification of the council.
Facts and circumstances are charged by complainants, which,
it is argued, impeach the fairness of the contract.   We do
not draw that inference from them.   That the agreement was
privately made, and without notice, is no evidence of fraud.
Some of the most prudent and judicious men in the country,
sensible that frauds are often committed at public sales of
property, in making their wills, direct their executors to make
private sales.   Combinations are very apt to be formed where

the sale is public, the value of the property great and the competition is likely to be inconsiderable. The mayor and council, it is probable, subserved the best interests of the city by selling the stock privately.

[9.] That the stock was sold for less than its value, and below what others would have given for it on the same terms and conditions, is a general charge, and taken alone, is not entitled to much influence in determining the moral character of the contract. But it is elsewhere stated, specially, that other gentlemen, who are named, offered $87 per share for the stock during that week, and before the finance committee had carried out the details and accepted the securities of Patton & Mustian. These charges, general and special, constitute the strength of the objection to the contract based upon the inadequacy of the consideration. The price offered amounted, in the aggregate, to $156.600. It was sold for $151.000. The difference is not so great as to produce, on any mind, the impression that there was fraud, or the sale would not have been made. "Unless the inadequacy of price is such as shocks the conscience and amounts, in itself, to conclusive and decisive evidence of fraud in the transaction, it is not, of itself, a sufficient ground for refusing a specific performance." *Coles vs. Trecothick,* (9 *Vesey,* 246.)

The allegation, that the stock was quoted, in the Savannah papers at $90 per share, is not an allegation that it was worth that sum. Indeed, the complainants, if it is to be presumed they offered for it what they considered its value, did not believe it to be worth the quotation price.

That Williams, on being informed of the price at which it was quoted, proposed to sell, and an agreement was drawn up, reported to and ratified by the council, does not impeach the transaction. If necessary to effect a sale, it was a propitious time to offer it. If the market became excited, or the stock had been advanced by the alleged recent arrangement with the Central and South-Western Rail Road companies, it presented a better opportunity for effecting the sale of so

large an amount of stock.   Without it it might have been impossible to have sold the stock at the price given for it.

That a motion to postpone action on the contract was voted down by the council, and the contract was immediately ratified, must be regarded as the decided judgment of the council, that the contract was advantageous to the city, unless impure motives for official conduct be imputed to them.

It is not pretended, in the record, that they had a personal interest in the subject, different from that which was common to all the citizens of Columbus.   It would be rash to presume that those who voted against the ratification, voted under the influence of sinister purposes; and yet, they have no higher claim to exemption from censorious imputations, than those members of council had who voted for the ratification.

But little effect can be given to the charge, that Williams had induced some of the members of council, and especially the committee on finance, to believe that authority had been given to him to sell the stock, and that they voted for the ratification under that belief.   The proceedings of council, on the report of the mayor, showed that no authority had been given to sell the stock.   A sale under authority, needs no ratification to give it validity.   But if it is to be understood that the authority extended to making a contract subject to ratification and no further, which was equivalent to authority to make a proposition only to sell, then the refusal to ratify would have been no repudiation of the act of the mayor or action of the council giving such qualified authority.   The proposed purchaser could not have been misled; and the rejection of a contract made with such a qualification, could not have given rise to complaint.   The delicacy of the members of council, therefore, whose votes were controlled by the alleged consideration, was unnecessary.   If a Court of Equity, then, had jurisdiction to interfere in such a case, the charges taken separately, suggest no sufficient ground for interfering by injunction; and taken collectively, they do not make out a case of suspicion of wrong, injustice or fraud against the corporate authorities.

Taking the answers of defendants in reply to the charges, and it is difficult to determine how the city could have been relieved from its imminent embarrassment without applying the stock to the payment of the debt incurred by its subscription.

As the answer of the city council is under the corporate seal only, and not sworn to by any member, we will refer to the sworn answer of the mayor only. No part of the large city debt created by the subscription for the stock had been paid. The first instalment of $25.000 was to become due in July, 1855. In April before, a sale of stock was ordered to meet this payment. An offer was had for $15.000 only, and that at $80 per share. Not being able to sell stock, a loan was resorted to, and the mayor and committee on finance were authorized to borrow $30.000 on the best terms they could.

They borrowed, on mayor's draft and some of the committee's indorsement, and on pledge of 700 shares of stock, $30.060, with power to the lender to sell in thirty days, on default. They expected, after the payment of the July instalment, to sell stock and pay the borrowed money; but there being no demand for the stock, they could not sell, and had to resort to a second loan to pay the first. They borrowed in New York, at 90 days, $31.000, and pledged, as security, 1000 shares of the stock. They endeavored to sell in Charleston, and failed. The $31.000 borrowed in New York, was to be paid 27th December, and another instalment of $25.000, would become due in July. The mayor considered it best to sell all the stock and pay the entire debt, and made the agreement, accordingly, with Mustian & Patton, without consultation with any person whatever. He made no contract, (and did not attempt to make one,) binding on the city. What he did, was submitted to the council and ratified by it. If the stock sold had depreciated after the sale, and the city had been subjected to heavy losses, and the inhabitants to taxation, because of the failure to sell, the conduct of the mayor and council, in losing so favorable an

opportunity to relieve the city, might have been the subject of animadversion. If the stock has appreciated, and the purchasers are likely to make something, even if it be considerable, that cannot be admitted, in Equity, as a ground of relief against a contract untainted with fraud. Suppose there was folly or want of judgment in the mayor and council in making the contract, if there was no fraud, it is binding. (8 *Price's Repts.* 620.)

But what benefit is to accrue to the complainants, if the defendants are enjoined?

[10.] What certain advantage is to enure to the citizens of Columbus? The complainants are not pledged to take the stock at the $87 per share offered; they do not ask it. In fact, the parties who made the offer, are not all complainants. They make no deposit of the money necessary for the relief of the city; nor do they exhibit the securities that they would offer for the unpaid balance, and tender them in a manner to enable the council or the Court to judge of them. In sales by masters, in Chancery, which are sales by the Court of Chancery, the biddings may be opened for sufficient reasons; but whenever that is done, a deposit must be made of an amount exceeding that for which the sale was made. The Court will not interfere unless some beneficial object is to be accomplished by it. But the sale opposed in this case, is not a sale by a Court of Chancery; it is a sale by one party to another, each party having the power and right to contract, and no complaint made by either party to the contract of fraud or unfairness; and, so far as the record speaks, there is no ground of complaint of one party against the other. That the complainants are property holders in the City of Columbus, under the facts in the record, does not place them in a higher position, as suitors in a Court of Chancery, than that of the parties.

They are willing to forego their rights as citizens and property holders, provided they can be allowed to partake of the profits of a contract, to prevent the execution of which

their bill is filed, on the basis of probable injury to them as property owners in the city.

Whether the injunction shall be held up, is a matter of sound, legal discretion with the Chancellor. He has considered it his duty to dissolve it. We are not prepared to say that he ought not to have dissolved it. His judgment is therefore affirmed.