THE MAYOR, etc., OF ATHENS *vs.* OAMAK *et al.*

[Jackson, C. J., did not preside in this case, on account of providential cause.]

1. Under an act of the legislature and a vote of the citizens in accordance therewith, the city of Athens, in 1873, subscribed for one thousand shares in the Northeastern Railroad Company, issued and negotiated bonds to pay this subscription, and for their redemption levied an annual tax upon the property within the city limits. The road was completed for about forty miles, which exhausted its funds, and it was unable to extend its construction further. Its stock fell from par to 7½ per cent, and unless it could be extended so as to connect with other progressing or contemplated improvements beyond the state, the stock taken by the city was likely to become worthless. To save this loss, the mayor and council entered into a contract with the Terminal Company to extend the Northeastern Railroad to a point named, within a specified time; and in consideration of this and certain advantages as to freight over the Richmond and Danville Railroad, the mayor and council transferred to the Terminal Company, the thousand shares of stocks belonging to the city. The road was completed for a portion of the agreed distance within the specified time, when the mayor and council, believing that they had already secured such extension as would be most conducive to the interests of the city, were proceeding to make another contract with the Terminal Company, whereby they would release the latter from its obligation to extend the road further, and in consideration of this release, the company would agree, within two years, to build and equip, or cause to be built and equipped, a railroad from the city of Athens to a point on the Georgia Railroad. Certain citizens and property-owners sought to enjoin the consummation of this contract, as being *ultra vires* and detrimental to the interests of the city and the rights of the complainants:

*Held,* that an injunction should have been denied. The governing body of the city has a discretion in the management and disposition of its property, and when they exercise this discretionary power *bona fide*, a court of equity will not interfere; nor is such a body answerable for an erroneous exercise of its discretion, although injurious consequences may result therefrom.

(*a.*) The fact that a vote of the qualified voters of the city was necessary to the original subscription to the stock did not make it necessary that another vote should be held as to the disposition made of it.

2. The second contract in this case was not a subscription to the stock of a railroad company on the part of the city, nor the assumption of any burden or liability by it, but was the substitution of one consideration for another which was deemed more advantageous.

October 27, 1885.

Municipal Corporations. Contracts. Railroads. Injunction. Constitutional Law. Before Judge Estes. Clarke County. At Chambers. August 31, 1885.

To the report contained in the decision, it is necessary to add only the following:

The clause of the charter of the city of Athens containing general powers is as follows:

" That the mayor and council of the city of Athens shall have full power to pass every other regulation or ordinance that shall appear to them necessary and proper for the security, welfare and interest of said city, or preserving the peace, health, order and good government of said city: Provided, such regulations or ordinances are not in conflict with the constitution and laws of this state or the United States." Acts 1872, p. 131.

The act of 1870 (Acts 1870, p. 325) authorized the mayor and council to subscribe to stock, contribute or endorse bonds of any railroad from Athens to Rabun Gap, in Rabun county, not exceeding $200,000, provided a majority of the qualified voters should vote therefor at an election held for that purpose. It was alleged in the bill that the city council had passed a resolution agreeing to the new contract set out in the decision, provided the Terminal Company agreed with them in regard to the construction of certain provisions in the original contract as to rates of freight, and had so notified the Terminal Company; and that they were ready to make the change as soon as they were assured on that point. The object of

the bill was to enjoin the making of the contract. The injunction was granted, and the defendants excepted.

T. W. RUCKER; POPE BARROW, for plaintiffs in error.

S. P. THURMOND; ALEX. S. ERWIN, for defendants.

HALL, Justice.

The discussion of this case took quite a wide range, and every point which the record presented, and which had even a remote bearing upon the issue involved, was carefully examined and closely canvassed. But the question upon which the grant of this injunction depends, we think, is confined to narrow limits.

The city of Athens, in the year 1873, subscribed for one thousand shares of stock in the Northeastern Railroad Company, which it was authorized by a vote of its citizens qualified to cast it, under and by virtue of an act of the general assembly of the state, and by the provisions of this act, it issued bonds which it negotiated to pay this subscription, and for their redemption, levied an annual tax upon the property within its limits. The road was completed to Lula, a point on the Atlanta and Charlotte Air-Line Railway, about forty miles distant from Athens. The company's funds were exhausted by constructing it to this point, and they were unable to extend it further. In 1881, the stock had fallen from the value of $100 per share to seven dollars and fifty cents. Unless arrangements could be made to extend the road further in the direction of Rabun Gap, to meet other improvements then either in contemplation or progress of construction, to Knoxville, Tennessee, the stock taken by the city of Athens would, in all probability, have soon become worthless, and to save it from this loss, the mayor and council of the city entered into a contract with the Richmond and West Point Terminal Railway and Warehouse Company, to extend the Northeastern Road from Lula, via Clarkesville

and Tallulah Falls, to Clayton, in Rabun county; and in consideration that they would do so within a specified time, and for some other advantages secured to the city and its inhabitants in the rates of freight from distant points over the Richmond and Danville Railroad and connecting roads under the control of this company, the mayor and council of the city transferred to the Terminal Company the thousand shares of the city's stock in the Northeastern Road. In pursuance and performance of this contract, the road was completed to Tallulah Falls; and before the time expired, when, according to the contract, it was to be extended to Clayton, the ·mayor and council, believing that they had already secured such extension in the direction of Knoxville, and other points, as would be most conducive to the interest of the city, were proceeding to enter into another contract with the Terminal Company, whereby they released the company from its obligation to extend the road from Tallulah Falls to Clayton, and in consideration of this release, the company undertook and agreed, within two years from the date of the contract, to build and equip, or cause to be built and equipped, a broad gauge railroad from Athens to some point on the Georgia Railroad between Madison and Covington, or at one of those places. The complainants, some of whom were both property-owners and citizens, and others of whom owned property in the city of Athens, sought to enjoin the consummation of this last contract, alleging that the city officials in making it acted *ultra vires;* that they had no power to enter into it without special authority from the legislature, or the consent of the qualified voters of the municipality, directing them to make it; that the change contemplated by it would be detrimental to the best interests of the city, and would be also hurtful to the rights and interests of the complainants. These latter allegations were denied by the defendants. How these disastrous consequences would result to the city, was not specially shown. The answer denied that the alleged pub-

lic injury was the real motive that induced the complain-
ants to institute the suit; but charged that most of them
were the owners of the stock or bonds of several corpora-
tions, whose interests and income might be affected by the
building of the proposed road, which would connect, at one
of the points named, with the Georgia Midland Road, of
which it would form a part, about to be built from Colum-
bus to Athens.   The injunction prayed was ordered; and
to this order the city of Athens, by its corporate authorities,
excepted, and brought the case by writ of error to this
court for review.

1. The question on which the right to this injunction de-
pends is, whether the governing authorities of the city, who
are charged by its charter and the general laws regulating
municipal corporations, with the care and improvement
of its effects and property, had the right to change this
investment in stock without express authority conferred
by the legislature, or by a vote of the inhabitants.   The
case of *Semmes vs. The Mayor, etc., of Columbus*, 19 *Ga.*,
471, which is very similar, if not identical, in its leading
circumstances with the one at bar, distinctly holds that the
governing body of the city has a discretion in the manage-
ment and disposition of its property, and that, where they
exercise their discretionary powers *bona fide*, a court of
equity will not interfere with them in the matter com-
plained of; that such a body is not answerable for an erro-
neous exercise of its discretion, although injurious conse-
quences may result therefrom.

It is also said in *Adams et al. vs. The Mayor, etc., of
Rome*, 59 *Ga.*, 771, " A further point in behalf of the city
is that, as the act of 1870 required a consent vote by a
majority of the qualified voters as a condition precedent
to issuing the bonds, a similar vote, or at least some vote
of the citizens, would be necessary to enable the mayor
and council to mortgage the water-works.   We cannot
discover any logical connection between the proposed con-

v 75-28

clusion and the premises from which it is sought to be drawn."

The result reached in these cases might be strengthened by the citation of many other cases, but it is so obviously proper that we should deem it mere waste of time and space to encumber our judgment with their display.    We know of no such restrictions upon the exercise of the power of the officers of the city as those here insisted on in the matters in question; they are certainly not found in the general law regulating the conduct of such public agents, and a diligent search of the act incorporating Athens, and that allowing it to take this particular stock, has failed to reveal them.    They cannot be implied, because they are not necessary to enable the city to secure its rights, or to carry into effect any of the duties imposed upon it; on the contrary, to countenance, much more to encourage, such proceedings upon the part of the inhabitants would, it seems to us, disable the municipal government from discharging its legitimate functions and performing promptly its most ordinary duties.    The delay entailed by a resort to such impediments would effectually destroy its efficiency, and would prove disastrous, if not destructive, in its consequences.    No improvement could be carried forward which involved the expenditure of means, for in every instance of the kind, somebody would be sure to think that his rights were interfered with, his property injured and his plans and purposes thwarted.

2. But apart from this position, it is insisted that this is an attempt by this municipal corporation indirectly to become a stockholder in a railroad company other than that in which it was authorized by the act of the general assembly to subscribe for and hold stock, which is in violation of the spirit, if not the letter, of par. 1, section vi. art. vii. of the constitution of 1877. Code, §5189.    According to this provision of the constitution, the general assembly is prohibited from authorizing any county, municipal corporation or political division of the state to become a

stockholder in any company, corporation or association, or to appropriate money for or to loan its credit to any corporation, company, association, institution or individual, except for purely charitable purposes. It is difficult to understand how, in this instance, the city of Athens has become a stockholder in this new company, or how she has appropriated money for it, or loaned it her credit. She proposes that the Terminal Company shall build and equip, out of its own means, or cause it to be done, the contemplated railroad. The contract does not entitle her to a dollar of stock in the company, or impose upon her any liability or burden whatever; she neither appropriates any money to the enterprise, nor imposes any additional burden upon her citizens, and in no way aids it by pledging her credit. When she entered into that contract, she owned no stock in the Northeastern Railroad; she had already parted with that for a consideration that has been partially paid, and which she is enjoying every day; she had no desire to insist upon the payment of the balance of the consideration, but was willing, through her authorized agents, to substitute it for another, which they, in the exercise of their discretion, deemed would be more advantageous to her.

The article of the constitution under which the section in question is found treats of "finance, taxation and the public debt." We think that the section was designed to prevent extravagant outlays by those municipal bodies, which the prospect of gain, offered by these enterprises, would tempt them to embark in, and thereby make occasion for a resort to the taxing power. This was the great wrong that the restriction was intended to prevent. The waste of corporate property by appropriating money raised by taxation, or which, if properly expended, would prevent the necessity of resorting thereto, fall directly within the reason of the prohibition.

In this instance, the city of Athens incurs no burthen not already upon her; she does not propose to do anything

which will increase her debt or render necessary a resort to further taxation; she only changes the terms of a contract already entered into and partly performed; she exchanges simply one consideration for another, which she esteems more valuable. In our view, this clause of the constitution would have to be very widely stretched to take in the case at bar; its application to such circumstances, we think, is wide of the intention of its framers. We cannot bring our minds to the conclusion that it was ever contemplated to hold these municipal corporations to existing subscriptions to stock, and prohibit them from utilizing the stock for corporate purposes by sale or exchange, or that, although it was depreciating in value and becoming worthless, the only way its owners could rid themselves of it was to allow it to perish on their hands. Surely no such absurd purpose was ever in the contemplation of the constitution-makers, as one which would deprive these municipalities of the power to save from wreck and ruin the property intrusted to their care.

We are forced to the conclusion that there is nothing, either in the facts of this case or the law applicable thereto, which required or authorized the grant of this injunction, and direct that, upon the return of the remitter in this cause, it be dissolved.

Judgment reversed.