## No. 14,512.

JAMES A. BRENNAN ET ALS., TAXPAYERS, VS. SEWERAGE AND WATER BOARD AND BOARD OF LIQUIDATION; CITY OF NEW ORLEANS VS. NEW ORLEANS SEWERAGE COMPANY (CONSOLIDATED).

### SYLLABUS.

1. The validity of an amendment to the Constitution, proposed as the General Assembly has a right to propose it, and adopted as the electors throughout the State have the right to adopt it, is in no manner affected by any petition which may, previously, have been presented to a municipal council or to the General Assembly.

2. By the terms of the amendment, proposed as Act No. 6 of the Extra Session of 1899, the Sewerage and Water Board is authorized to acquire, for the City of New Orleans, "the plant and franchise of any water or sewerage companies" in that city. There having been, when the amendment was proposed and adopted, but one water, and one sewerage company, in New Orleans, the word "plant" is held to apply to the physical means provided by those particular companies for the accomplishment of the ends for which they were established, though, in the case of the Sewerage Company, they do not constitute a completed plant.

3. The Sewerage and Water Board, established by constitutional amendment, and authorized, subject to the ratification of the City Council, to acquire the plant of the Sewerage Company, made a contract to that effect which was ratified as required. Its consummation is enjoined by citizens, claiming as taxpayers, on the grounds that it is *ultra vires* of the Board, and that the

price agreed on is excessive. *Held,* that the Board and the city are acting within the power conferred on them, and, there being no fraud imputed, or shown, no invasion of private rights, no manifest oppression, and no gross abuse, their action is not subject to judicial control.

# A PPEAL from the Civil District Court, Parish of Orleans—*Ellis, J.*

*Charles Louque, Louis P. Bryant, J. J. O'Connor* and *A. B. Philips,* for Taxpayers, Plaintiffs and Intervenors, Appellees.

*Charles J. Théard,* for Sewerage and Water Board, Defendant, Appellant.

*Branch K. Miller,* for Board of Liquidation of the City Debt, Defendant, Appellee, Appellant.

*Samuel L. Gilmore,* City Attorney, for the City of New Orleans, Plaintiff, Appellee.

*Fenner, Henderson & Fenner,* for New Orleans Sewer Company, Defendant, Appellant.

The opinion of the court was delivered by MONROE, J.

On application for rehearing by MONROE, J.

MONROE, J.   In the first of the above entitled cases, James A. Brennan and James H. Douglas seek, by injunction, to prohibit the consummation of a contract entered into between the Sewerage and Water Board and the New Orleans Sewer Company, and ratified by the City of New Orleans, whereby the Board has undertaken to acquire, for the City, certain tangible property, and franchises, of which the company claims to be the owner; the grounds relied on being, that the Board is without authority in the premises, and that the price agreed on is excessive. When these plaintiffs appeared in court, there was already pending a suit which had been brought by the City, in July, 1896, to annul the ordinance and contract under which, as transferree, the New

Orleans Sewer Company now claims to be the owner of the franchises in question, and to recover certain damages alleged to have been sustained by reason of the non-execution of that contract, and the suit last mentioned was transferred to the division to which the other had been alotted, pursuant to an agreement, containing, among others, the following stipulations: "1. These cases shall be and are consolidated, and they shall be heard and determined in Division A, before Judge Ellis, at one and the same time. 2. At the trial, the evidence on the issues in said suit No. 67,254, entitled Brennan vs. Sewerage and Water Board, shall be first taken. 3. The evidence on the issues in suit No. 50,365, entitled City of New Orleans vs. New Orleans Sewerage Company, shall then be taken. 4. The matters at issue shall be argued at one time, at the earliest practicable moment. 5. The court shall then render one judgment and decree disposing of all the issues in each of the consolidated suits; and there shall be but one record on an appeal by either, or all, parties, and all issues shall be considered as before the Supreme Court when the cause is taken on appeal of any or all parties."

\*     \*     \*     \*     \*     \*     \*

And this agreement appears to have been carried into effect in all respects, save that separate judgments were rendered in the two cases, of which, however, no complaint is here made. There was judgment in favor of Brennan and Douglas "forever restraining * * * the defendants * * * from carrying into execution the proposed purchase of the property, rights and supposed franchise of the Sewer Company, and from paying them * * * any sum of money towards said purchase under the proposition" attacked by the plaintiffs. And there was judgment in favor of the City, and of certain intervenors who had joined the City, in the case last mentioned in the above caption, "annulling ordinance 6142 C. S., adopted March 22, 1892, and the contract thereunder by act before J. D. Taylor, notary public, April 13, 1892, as being illegal, null, and void, and of no effect. * * * Dismissing and rejecting the intervention of N. W. Jordan and of his assignee, the New Orleans Sewer Company," and dismissing, as in case of non-suit, the claim of the City, for damages. And from these judgments, the parties cast have appealed. The facts, as we find them, from the transcript and from the admissions of counsel, and which, in the main, are undisputed, are as follows: Act 125 of 1880, amending cer-

tain sections of the Revised Statutes, authorizes the establishment of corporations for sewerage, among other, purposes, and provides that such corporations shall not construct their works through the streets of any city or town without the consent of the council thereof. It further provides that the council giving the necessary consent "may, in the interest of the public health and cleanliness, pass all needful ordinances and police regulations to make effective the system of sewerage * * * adopted with reference to all houses and lands within the municipal limits."

It further provides that such corporations may borrow the money "required for the construction, repairs, or acquisition of property, or franchises, and, for this purpose, may issue bonds, or other obligations, secured by mortgage upon the franchises and all the property * * * of said companies, * * * with power to sell, pledge, or otherwise dispose of, said bonds."

On March 24, 1892, the City Council of New Orleans, by ordinance 6142 C. S., authorized the mayor to enter into a contract granting to A. A. Woods and his associates the privilege of constructing, and maintaining, for fifty years, a system of sewers through the streets of New Orleans; and the contract was entered into accordingly, by act before Taylor, notary, April 13, 1892. It was provided that, within six months from the passage of the ordinance, Woods should transfer said contract to a corporation to be organized under act 125 of 1880; and he made the transfer, within the time specified, to the New Orleans Sewerage Company, which was organized September 19, 1892. It was also provided that the company should begin its surveys within six months from the date of its organization, and should complete one-fifth of the entire work contemplated by the contract within each year thereafter, for five years. In January, 1894, however, an extension of "two additional years," was granted to the company "within which to begin and to complete the sewerage system." The company first undertook to accomplish the work called for by its contract through the New Orleans Construction Company, but subsequently employed the contracting firm of Stewart & McDermott, who abandoned the job in October, or November, 1895. In the meanwhile, and in order to raise the necessary funds, the company had caused to be executed bonds, secured by mortgage on its property and franchises, to the amount of $2,000,000, of which some

.$386,500 had been issued, $375,000 of that amount having been negotiated in the city of Boston, and, possibly, the larger proportion of the proceeds having been put into the work. Upon the withdrawal of Stewart & McDermott, active operations were suspended; and, on May 22, 1896, the president of the company appeared before a committee of the City Council and made a statement of its affairs, from which it appeared that it was not in a condition to go on with the work, and in the course of which he said "that unless the company was controlled by gentlemen of higher standing, he would be glad to have the franchise returned to the City." It does not appear, however, that he was authorized by the company to make such a statement, or that it was made with the approval of the bondholders. On May 26th, a motion offered by the committee just mentioned, was adopted by the council, directing the city attorney to take "necessary steps to have the New Orleans Sewerage Company put in default, and institute the necessary legal proceedings to have their charter declared forfeited, and to annul the ordinance granting all privileges to A. A. Woods, his successors, transferrees, and assigns." In June, following, certain creditors of the company filed a petition alleging that it was insolvent, that its operations had been suspended, and that it had grants and franchises which would be lost, to it and to its creditors, unless the court would appoint a receiver. And, the petition having been accompanied by a resolution of the board of directors of the company, virtually admitting the truth of its allegations, and service thereof having been accepted by its president, a receiver was appointed. Thereafter, in July, the city attorney instituted suit, according to his instructions, praying that ordinance 6142 C. S. be annulled, and the City relieved from further obligation thereunder, and for damages; the grounds of action, as stated, being: (1) That the company had not completed one-fifth of its work in each year, etc. (2) That it had abandoned the work and was insolvent, and that a receiver had been appointed. (3) That it had failed to put the streets in order after laying its pipes. (4) That the bond furnished was not such as the contract called for. To this, and to the supplemental petition, filed not long afterwards, the company set up various grounds of exception and defense.

The case was not, however, brought to trial, and during the early part of 1897, all the assets of the company, including the rights, privi- .

leges and franchises covered by the mortgage, were sold by order of court, at the instance of the holder of five of the bonds, and were adjudicated to N. W. Jordan, as the holder of 375 outstanding bonds, of the par value of $1000 each; and the adjudicatee then intervened in the suit and asserted title to the property so adjudicated. In September,. 1897, another supplemental petition was filed on behalf of the City, in which it was alleged that the contract with Woods was *ultra vires* of the City; because in contravention of Section 1, of Act 135, of 1898,. and because it undertook to compel householders to cease using vaults and to pay cash for sewer connections, or else subject their property to a lien; that it was unconstitutional, in that it undertook to require the payment of monthly rates, and thereby imposed an unauthorized tax; and that neither said contract nor the franchises thereby conferred were assignable. In December, 1897, a number of taxpayers intervened and joined the plaintiff in its demands. In September, 1898, Jordan sold the property which had been adjudicated to him to the New Orleans Sewer Company (a new corporation) for $2,324,300, represented by 19,993 shares of its stock, and $325,000 of its bonds, secured by mortgage on the property sold.

In the meanwhile, the case (The City vs. The Sewerage Company)' remained undisposed of, and no effort appears to have been made to fix it for trial until April of the present year, when one of the counsel for the plaintiffs in the Brennan case, having intervened in his capacity as a taxpayer, made a motion to that effect, and it was then transferred and consolidated, as has been already stated. The explanation of this inaction on the part of the litigants is, that negotiations looking to a compromise between the City and the New Orleans Sewer Company,. claiming to be the transferree of the New Orleans Sewerage Company, were begun and broken off, from time to time, but were never finally abandoned.

It is necessary, now, to a correct understanding of the questions at issue, that we should inquire into the origin, powers, and situation of the Sewerage and Water Board, and into the action taken by that body which is here made the subject of complaint.

In April, 1899, there was presented to the City Council of New Orleans a petition, signed by more than one-third of the property taxpayers, asking for the levy of a two-mill tax, for forty-three years, the

proceeds of which should be applied, in such ratio as might be required, to the following purposes of public improvement, to-wit:

"1. To acquiring title by the City, by construction or purchase, or both, to a system of waterworks; to the extension thereof throughout the city; and to the purification of the water supply therefrom. 2. To the construction, throughout the city, including the Fifth District, of a free sewerage system, with free water therefor, the title whereof shall be in the city."

The petition further prayed the council to obtain legislative and constitutional authority for the capitalization of the tax to be levied and wth respect to other matters. An election was accordingly held, in order to take the sense of the property taxpayers, and the tax was voted. The General Assembly was, then, in August, 1899, convened, in extra session, and an amendment to the constitution, in the form of an elaborate piece of legislation for the carrying into effect of the proposition of the taxpayers, was submitted to the electors of the entire state, and adopted, including a certain reservation, to the General Assembly, of the right to amend the same. This legislation, now embodied in the constitution, establishes the Sewerage and Water Board and, among other things, provides:

"Sec. 15. That said Board shall have power, by a vote of twelve of its members, to acquire, in the name and for the benefit of the City of New Orleans, the plant and franchises of any water or sewerage companies in the City of New Orleans, but no contract for that purpose shall be valid until ratified by ordinance of the Common Council of the City of New Orleans. In case no agreement can be reached between said Board and the City Council, on the one side, and the representatives of the said company on the other, as to the price to be paid said companies for their property and franchises, and it shall become necessary for the City of New Orleans to expropriate the same, the price to be paid on such expropriation, shall be paid by said Board out of the proceeds of the bonds aforesaid. The outstanding mortgage bonds of such companies may be assumed by the City as part of the price. Nothing in this act shall be held to affect the right of either the State of Louisiana or the City of New Orleans in the pending litigation against the New Orleans Water Works Company or the New Orleans Sewerage Company."

The Sewerage and Water Board, thus established and empowered, appointed a Board of Advisory Engineers, and, in June, 1900, the Board last mentioned recommended that the general superintendent be authorized to make a careful examination of the existing sewers, and to inventory and appraise the property of the Sewer Company, and this was followed by a similar recommendation from the Board's committee on sewerage and water. On December 15, 1900, the Board of Advisory Engineers reported to the general superintendent as follows:

"The examination made of the sewers built in the City before 1895 by the New Orleans Sewer Company has given very satisfactory and gratifying results. It has demonstrated that a large brick sewer, twenty feet below the surface of the ground, and small pipe sewers, five to twelve feet below same, can be built so as to remain in a stable condition in the peculiar soil underlying. It has also produced sufficient evidence from which to assume that the amount of ground water seepage likely to enter the sewers may be taken at one million gallons per square mile of territory, per day, or one-third of the average rainfall. This seepage water will not only improve the condition of the upper layers of the soil in the city, but also facilitate the satisfactory carriage of the sewage during the early years, when comparatively few houses have been connected with the system and it will also give the sewerage a great dilution. (Signed) B. M. Harrod, Rudolph Hering, George W. Fuller, L. W. Brown, A. C. Bell, Board of Advisory Engineers."

On July 18, 1901, the Sewerage and Water Board adopted the following resolution:

"Whereas, after duly authorized survey and investigation, it has been declared in the official reports of the general superintendent of the Sewerage and Water Board that certain property belonging to the New Orleans Sewer Company, consisting of real estate, material, and, more or less, completed work of construction may be made available in executing the adopted plans for the new sewerage system of this city, with marked economy and without impairment of the efficiency of the system, under these plans,

"Be it resolved, That the committee on sewerage and water, of this Board, be instructed and fully empowered to have such additional and supplementary survey and investigation of the afore mentioned property made with the assistance or employment of disinterested experts.

.at their discretion, as will fully and definitely establish what portion, if .any, of the said property may safely be acquired for utilization in the work of construction under the plans adopted for the new sewerage system, and that the said committee make report and offer recommendations covering the results of their labors, to be submitted to this board, if practicable, not later than its next regular meeting in August."

This was modified, in September, so as to provide that the experts .should make a careful appraisement of the value of the property and to authorize the committee to invite the Sewer Company to participate in the survey and bear half of the expense, one expert to be appointed .on each side. Agreeably to the action thus taken, A. C. Bell, former .city engineer, was appointed on behalf of the Water Board and G. A. Nettleton on behalf of the Sewer Company, and they made the investigation together. Mr. Nettleton estimated the property to be worth .$229,444.80. Mr. Bell valued it at $169,619.83. During the course of this investigation, to-wit, on November 17, 1901, there was published in the Daily States of this city, a letter from the secretary of the Sewerage and Water Board calling the attention of the public thereto and inviting any persons who might see fit to do so, to avail themselves of the opportunity thus afforded to inspect the sewers. As soon as the investigation was completed, the reports of the experts were submitted to Messrs. Hering and Fuller, consulting engineers of the Board, who, upon January 14, 1902, gave their opinion in writing, as follows:

"* * * We beg to state that we have very carefully considered the various matters in the premises and have reached the following conclusions:

"1. As to the condition of the pipe and brick sewers of the New Orleans Sewer Company, and, after minor repairs suggested by the experts, their fitness for incorporation into the new sewerage system for which plans were recently adopted, the evidence at hand shows they can be incorporated with absolute safety. The thoroughness of the several inspections of these sewers, and the resulting records, place this matter in such a light that, on an engineering and physical basis, it is no longer a question open for discussion.

"2. As to the value of the sewers and other tangible property of the Sewer Company, we have made a detailed examination of the two appraisements, by Mr. Bell, on behalf of the Sewerage and Water Board,

and by Mr. Nettleton, on behalf of the Sewer Company. Mr. Bell has made a very conservative report in the interests of your Board, and we see no reason whatever for supposing that any reputable contractor would undertake to construct this work for a sum less than his estimate. Mr. Bell's figures as to unit prices, correspond quite closely with those considered by your Board of Advisory Engineers, at their meeting in December, 1900, and applied to the average conditions and volume of work represented by the entire sewerage system now proposed for your city. Mr. Nettleton, on the other hand, appears to regard the value of the comparatively few existing sewers as having no connection with the large mileage for the remainder of the city, and lays stress upon the difficult features which were encountered in the actual and pioneer construction of the first portion of the entire system. We believe that this explains, to a considerable degree, the discrepancies in the two estimates, due to differences in the prices usually prevailing in the same place for very large and for small volumes of work.

"3. We have no hesitancy in stating our opinion that the Sewerage and Water Board could well afford to pay, at least, the amount estimated by Mr. Bell for these existing sewers. If they were to be replaced, independently of the remaining portions of the complete system, we think it not unlikely that Mr. Bell's figures might be considerably increased, as shown by actual lettings. Rather than to hold in complete abeyance the construction of exceedingly important modern sanitary work for your city, by a disagreement as to their true value, we consider that the discrepancy in the two appraisements is of small significance when viewed as a broad business proposition, and with reference to the vital interests associated therewith."

On the witness' stand, during the trial, the general superintendent, Mr. Earl, designer of the plans for the constructed sewers and designer of the plans for the new system (in all essential particulars exactly similar); Mr. Crotts, his first assistant to-day, and his first assistant when the existing sewers were constructed; and Mr. Stephens, the engineer of Stewart & McDermott, the contractors who built those sewers, expressed, in the most positive manner, the same views as Messrs. Bell and Nettleton and Messrs. Hering and Fuller, with regard to the condition of the existing sewers, their durability and absolute safety, as well as easy practicability of incorporating them in the new system.

In addition to the investigation thus made in regard to the value of the tangible property of the Sewer Company, the Board made inquiry as to the value of the privileges and franchises of which that company claimed to be the owner and as to the status of the litigation, then pending upon the subject, and which had been pending for several years, between the company and the city, and it learned, that three among the ablest law firms in the city, giving separate opinions, had advised: (1) that, assuming the Sewer Company to have been in delay, such delay did not, *ipso facto,* dissolve its contract, but only gave the City the right to elect between granting further time, insisting upon specific performance, or claiming a dissolution; (2) that, assuming the City to have elected to claim a dissolution, the contract would, nevertheless, remain in force until dissolved by judicial decree; and, (3) that the facts of the case were such as to justify the expectation that the courts would grant the company further time, under C. C. 2047. Consulting its own legal adviser, the very able and efficient city attorney, the Board was informed that "in his opinion the City would ultimately win the suit; that, although he did not think any writ of injunction restraining the Board from sewerage construction should issue from either the State or United States courts, he could not foresee what steps might be taken by the company or its bondholders for the purpose of so restraining the Board; that, if an injunction should issue from the State court, it could be bonded, but if one should issue from the United States court, it could not be bonded; that in case of proceedings in the United States court and an appeal to the Supreme Court of the United States, the litigation might last for two or three years;" and, finally, in answer to the inquiry made by the Board, whether, under existing conditions, the Board should advertise for bids for the construction of the new sewerage system, without any effort to secure the rights, if any, and the property, of the New Orleans Sewer Company, he stated, "my advice in the premises is, that the Board should use every effort to obtain an amicable settlement of the pending litigation, and acquire whatever right, if any, and property the company may have, and, in case such efforts fail, the suit should be energetically prosecuted to a conclusion."

And that the city attorney has found no reason to change the opinion thus expressed is shown by the fact that whilst he has ably and earnestly argued on behalf of the City its case against the Sewer Company,

he has also testified as a witness that the contract entered into by the Sewerage and Water Board was, in his opinion, advisable; that the price agreed on was reasonable; and that the action of the Board, in the premises, was wise and judicious.

Basing its action, therefore, in so far as the availability and pecuniary value of the tangible property was concerned, upon the advice of civil engineers of the highest standing, employed and paid for that service, and, insofar as the claims of, and the pending litigation with, the Sewer Company were concerned, upon the advice of counsel, upon whom, under the law, and from any other point of view, it was fully authorized to rely, the Board, after some negotiations, in which the Sewer Company demanded $400,000, finally, upon February 20, 1902, closed, by its ratification, subject to the action of the City Council, a contract which had been agreed on between its executive committee and the Sewer Company, to the following effect: "The Sewerage and Water Board to pay the New Orleans Sewer Company, * * * in cash, the sum of $295,000, with a warranty of satisfaction, by the Board, of all taxes unpaid and legally due by said company to the City of New Orleans or the State of Louisiana, on said property, and a pledge to effect immediate settlement of the suit now pending in the civil courts for the forfeiture of the charter and franchise of New Orleans Sewer Company."

The taxes referred to amount to $9,173.20, so that, the total **price** agreed on was $304,173.20. And the contract so made was ratified by the City Council a few weeks later.

It may be remarked, in concluding this résumé of the facts and of the evidence adduced, more particularly in the case against the Sewerage and Water Board, that, the two plaintiffs having taken the stand as witnesses, Mr. Brennan testifies, in substance, that his principal ground of complaint in bringing the suit was, that the Board was about to pay too much for the property to be acquired; that he would have been willing for it to have paid $200,000; but $95,000, for the franchise, was too much"; and Mr. Douglas testifies that he does not believe in sewerage.

## OPINION.

There is no suggestion in the pleadings that the Sewerage and Water Board or the City Council were actuated by any corrupt motives in

making and ratifying the contract which is here attacked; nor is it specifically charged that they have been guilty of gross neglect of duty, extravagance, or misconduct, though this latter charge may, perhaps, be inferred from other allegations. The grounds of complaint are (1) that the Board is without authority to buy the property, and (2) that the price is too high.

Under Article 321 of the Constitution, it was competent for the General Assembly to have proposed an amendment to that instrument, without regard to any petition from the taxpayers of New Orleans; and the validity of an amendment, proposed as the General Assembly had the right to propose it, and adopted, as the electors throughout the State had the right to adopt it, is in no manner affected by any petition which may, previously, have been presented to a municipal council, or to the General Assembly. Assuming, then, for the purposes of the argument, that when the taxpayers of New Orleans asked that a tax be levied for the "construction," throughout the city, of a free sewerage system, the language was selected with the deliberate purpose of restricting the use of the money to be raised to "construction" and of preventing its use, no matter how advantageous it might be, in the purchase of sewers already constructed, it, nevertheless, remains, that an amendment to the Constitution has been proposed and adopted whereby the Sewerage and Water Board is established and is authorized to use the proceeds of the tax in question in acquiring, whether by construction or otherwise, "in the name, and for the benefit, of the City of New Orleans, the plant and franchises of any Water or Sewerage Companies in the City of New Orleans," subject only to the condition that any contract having that purpose in view shall be ratified by the City Council. If the taxpayers had any reason to complain that the amendment did not correctly interpret their petition, their remedy was to have made that fact known before it was proposed, or to have defeated it when it was submitted to the electors for adoption. It is not, however, suggested that there was any complaint, or that any effort was made in either of the directions indicated, and it is fair to suppose that it was considered desirable that it should be made clear that the proceeds of the tax to be levied might be used for the purchase, as well as the construction, of a sewerage plant, and it was made clear, accordingly, and beyond recall.

It is said that the language of the amendment does not apply to the property of the Sewer Company, because that property does not constitute a "plant," but consists, mainly, of some thousands of feet of constructed sewers not yet connected with any machinery or other apparatus; and we are referred to certain testimony to the effect that the pumping station, with the machinery, pumps, etc., of the Waterworks Company are the "plants" of that company. The conclusion to be drawn from this argument and illustration is, that if the building, machinery, pumps, etc., thus referred to, should be burned, or otherwise destroyed, the Waterworks Company would be without a "plant," or any other property, that the Sewerage and Water Board would be authorized to buy. We do not concur in this view, and we should, probably, be doing injustice to the witnesses by so interpreting their testimony. A building in which engines and pumps are establshed for the distribution of water, but from which there are no pipes or conduits leading, may be called a waterworks plant, and a system of pipes intended for the distribution of water, but with no provision by which that distribution can be made, may, with equal propriety, be so called; and in neither case would the misnomer be more serious than if we should call an animal, otherwise a horse, by that name, though he should come into the world with but two legs or should lose all of his legs after his arrival. So far as the instant case is concerned, the word "plant" is used in the amendment to the Constitution with direct and unmistakable reference to *one* Waterworks Company and *one* Sewer Company (for there are no others in New Orleans), and in order to designate the physical means, such as they are, which those particular companies have provided for the accomplishment of the ends for which they were established. And it is sufficient for the purpose.

Considering the remaining ground upon which the plaintiffs rest their action—*i. e.*, that the price which the defendant has agreed to pay for the property is excessive—it will be observed that the Constitution, as amended, in conferring authority on the Sewerage and Water Board to acquire the "plant and franchises" of any sewerage companies, imposes no other restriction or limitation than that the acquisition shall be ratified by the City Council. There is no provision as to the manner of the acquisition, or, if it should be by purchase, as to the price, or terms of payment. Whether, therefore, such property should be pur-

.chased at all, and, if so, at what price, and on what terms, are matters that are left by the same high authority from which this court receives its jurisdiction, to the discretion of the Board and of the City Council.

"This discretion" (says Mr. Dillon) "where it is conferred, or exists, cannot be judicially interfered with or questioned, except where the power is exceeded, or fraud is imputed and shown, or there is a manifest invasion of private rights. Thus, where the law or charter confers upon the *City Council, or local legislature, power to determine upon the expediency or necessity of measures relating to the local government,* their judgment upon matters thus committed to them, whilst acting within the scope of their authority, cannot be controlled by the courts. In such a case, the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers." (Italics by the author.) Dillon on Mun. Corps., Vol. 1, pp. 151-2, Sec. 94.

The same doctrine is somewhat differently stated, as follows:

"The general rule is, that, where legislative or discretionary powers are conferred upon municipal corporations, the courts will not interfere, unless, in the exercise of such discretion, there is fraud, manifest oppression, or gross abuse * * *. The courts will not restrain, control, or coerce, the action of a municipal corporation on the ground that it is merely unwise, extravagant, or erroneous, or a mistake of judgment." A. & E. Enc. of Law (2nd Ed.), Vol. 20, pp. 1229-30, and notes.

And, whether stated in the one way or the other, it finds support in the jurisprudence of this court and of the country. First Municipality vs. Pease, 2 Ann. 542; Certain Inhabitants vs. City, 14 Ann. 452; Cannon vs. City, 27 Ann. 16; Watson vs. Turnbull, 34 Ann. 856; Handy vs. City, 39 Ann. 112; Conery vs. Waterworks Co., 41 Ann. 910; N. O. Gas Light Co. vs. City, 42 Ann. 192; Johnson vs. City, 105 La. 151; Hughes vs. Board, 108 La. 146; Semmes vs. Columbus, 19 Ga. 471; Shannon vs. O'Boyle, 51 Ind. 565; Athens vs. Carnak, 75 Ga. 429; Baird vs. Mayor, 96 N. Y. 567.

In the present instance, the Sewerage and Water Board did not exceed its powers in contracting for the purchase of the property in question; there is no fraud imputed to it, or shown, nor is there any invasion of private right, manifest oppression, or gross abuse. The Board is composed of the nine members constituting the Drainage Com-

mission; that is to say, the Mayor of the City, the Chairman of the Council Committees on Finance, Budget, Water and Drainage; the President and two members, selected by it, of the Board of Commissioners of the Orleans Levee District; and the President and one member, selected by it, of the Board of Liquidation of the City Debt; to whom are added seven property taxpayers, appointed by the Mayor of the City, from time to time, for terms of twelve years, being one from each municipal district; thus, making sixteen members, of whom, it was necessary to have obtained the assent of twelve, as also the assent of a majority of the members of the City Council, for the purposes of the contract in question. These citizens have attained their present high and responsible positions, whether elected or appointed thereto, because they have the confidence of the community in which they live, and, in the estimation of that community, are competent to discharge the duties of those positions. In order, fairly, to judge the particular action which is here made the subject of complaint, it is to be borne in mind that the people of New Orleans are not only demanding a system of sewerage, but are demanding that it be speedily provided; and we are, then, to ask, whether any one situated as were those upon whom rests the burden of satisfying that demand would have done better, or otherwise, than was done by them. They sought the best expert advice obtainable as to the availability, for the purposes of the sewerage system which has been adopted, and as to the cash value, of the sewers which had already been constructed, and of other property which had been acquired for a similar purpose, and they consulted the legal adviser assigned to them by law as to the status and possible effect upon their future operations of certain litigation in which the right of a private corporation to establish and maintain sewers in New Orleans was involved. They went further, and invited the public, whom they are endeavoring to serve, to participate in their deliberations, and, after a most careful consideration of the subject, they acted upon the information and advice so obtained. It is true that there was no other proper course for them to have pursued, and if this court should undertake to discharge the duties which the Constitution has imposed upon them it could not, properly, do otherwise than as they have done—that is to say, institute what it might believe to be a competent investigation of the physical and legal questions presented and then act in accordance with its best judgment.

But the right and authority to determine how to establish a system of sewerage in New Orleans, with whom to contract, what property to· acquire and how best to expend the money to be raised, are matters which, happily, are not confided to this court, but to the Sewerage and Drainage Board and the City Council. And, it appearing that those· bodies have acted within the scope of the authority conferred upon them, honestly, carefully and in good faith, those for whom they have acted, are bound, as a single individual would be bound under like circumstances. If there is any law. in this State under which a contract· so made can be annulled, for no other reason than because the price· paid is thought to be excessive, our attention has not been called to it.

Beyond this, it could, perhaps, be shown that the contract in question presents the essential features of a "transaction or compromise," which is declared to be "An agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences, by mutual consent in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." C. C. 3071.

And concerning which agreements it is provided, that they "have, between the interested parties, a force equal to the authority of things· adjudged. They cannot be attacked on account of any error in law or any lesion. * * *" C. C. 3078.

We, therefore, conclude that the contract in question should be sustained as valid and binding, and that the demands of the plaintiffs, Brennan and Douglas, should be rejected. In this situation, it would seem that the suit brought by the City against the Sewer Company must abate, since the City has acquired by contract all that it claims in that suit, and, by the same contract, is bound, with the Sewerage and Water Board, to "effect the immediate settlement" thereof. If, however, further action by this court should be considered necessary, it may be taken in the future.

For these reasons, it is ordered, adjudged and decreed that the judgment appealed from, in favor of the plaintiffs, James A. Brennan and James H. Douglas, and against the defendant, the Sewerage and Water Board, be annulled, avoided and reversed, and that there now be judgment in favor of the said defendant and against said plaintiffs, rejecting the demands of the latter at their cost in both courts.

ON APPLICATION FOR REHEARING.

MONROE, J.   In this case, it is ordered, adjudged and decreed that
the decree heretofore entered be supplemented by the addition of the
following, to-wit:  It is further ordered, adjudged and decreed that the
judgment appealed from, in favor of said plaintiffs, James A. Brennan
and James H. Douglas, and against the New Orleans Sewer Company
and the Board of Liquidation of the City Debt, be annulled, avoided
and reversed, and that there now be judgment in favor of said defend-
ants and against said plaintiffs rejecting the demands of the latter and
dissolving the injunction issued at their instance, at the cost of said
plaintiffs in both courts.